UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

HERBERT DAVIS,                          *
                                        *
            Plaintiff,                  *
                                        *
      v.                                *          Civil Action No. 13-cv-11900-IT
                                        *
PAUL W. MURPHY, STEPHEN M.              *
MEADE, and STEPHEN C. McMANUS,          *
                                        *
            Defendants.                 *

MEMORANDUM & ORDER ON CROSS-MOTIONS FOR PARTIAL SUMMARY
JUDGMENT

March 28, 2018

TALWANI, D.J.

      In the above-captioned civil rights action, Herbert Davis brings five claims against

Boston Police Sergeant Detective Paul W. Murphy, Boston Police Lieutenant Stephen M.

Meade, and Boston Police Detective Stephen McManus based on alleged deprivations of Davis's

rights under the United States Constitution, 49 U.S.C. § 1983, and Massachusetts law: (1) a

§ 1983 claim for false arrest (Count I), Am. Compl. ¶¶ 49-53 [#108]; (2) a § 1983 due process

claim based on fabrication of false inculpatory evidence and failure to disclose exculpatory

evidence (Count II), Am. Compl. ¶¶ 54-59; (3) a § 1983 malicious prosecution claim (Count III),

Am. Compl. ¶¶ 60-65; (4) a claim under Massachusetts law for false imprisonment (Count IV),

Am. Compl. ¶¶ 66-68; and (5) a claim under Massachusetts law for malicious prosecution

(Count V), Am. Compl. ¶¶ 69-72. Pending are McManus's Motion for Partial Summary

Judgment [#177] on Counts I, III, and IV,[1] and Davis's Motion for Partial Summary Judgment

---

[1] McManus's initial briefing also sought summary judgment as to Count V. McManus informed
the court at oral argument that he is no longer moving for summary judgment as to this Count.

[#180] on Counts III and V. [2] For the reasons that follow, both McManus's and Davis's motions for partial summary judgment are DENIED.

I.  Standard

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' if 'the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.'" Cherkaoui v. City of Quincy, 877 F.3d 14, 23-24 (1st Cir. 2017) (quoting Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). "Facts are material when they have the 'potential to affect the outcome of the suit under the applicable law.'" Id. at 23 (quoting Sanchez, 101 F.3d at 227). "At the summary judgment stage, [a court] must draw all reasonable inferences from the record in the light most favorable to the nonmoving party, disregarding any 'conclusory allegations, improbable inferences, and unsupported speculation.'" McGrath v. Tavares, 757 F.3d 20, 25 (1st Cir. 2014) (quoting Alicea v. Machete Music, 744 F.3d 773, 778 (1st Cir. 2014)).

II.  Background

Unless otherwise indicated, this background comes from the parties' Local Rule 56.1 statements. See Defs.' Statement of Undisputed Material Facts ["Defs.' SOF"] [#179]; Pl.'s Statement of Undisputed Material Facts ["Pl.'s SOF"] [#181]. Neither party disputes the following facts. Where material disputes remain, they are highlighted in the court's legal analysis and viewed in the light most favorable to the non-moving party.

---

[2] Also pending is Murphy's motion for summary judgment, which will be addressed by separate order. Further, Meade filed a motion for summary judgment as to all claims, which was allowed as unopposed. See Electronic Order [#193].

Boston Police Detective Stephen McManus was assigned to a Federal Bureau of Investigation ("FBI") Drug and Gang Task Force ("Task Force") beginning in 2008. Defs.' SOF ¶ 1; Pl.'s SOF ¶ 17. McManus worked alongside other Task Force members out of the FBI office in Boston, where he was supervised by FBI Special Agent Richard Teahan. Defs.' SOF ¶¶ 7, 18. In April 2010, the Task Force retained Darren Sheridan as an informant. Id. ¶ 8. Over the course of the spring and summer months of 2010, McManus worked with Sheridan on at least seventeen Task Force investigations. Pl.'s SOF ¶ 23.

Task Force members learned in August 2010 that Sheridan had engaged in unauthorized illegal activities by purchasing crack cocaine and marijuana. Pl.'s SOF ¶ 24. On August 17, the Task Force disclosed Sheridan's illegal activities to the United States Attorney's office. Id. ¶ 25. On August 25, Special Agent Ryan O'Neil, Sheridan's "handler" on the Task Force, met with Sheridan and prepared a lengthy Task Force memorandum detailing Sheridan's unauthorized purchases of controlled substances. Id. ¶ 27; Defs.' SOF ¶ 8. Handwritten at the top of this report is a note from Task Force Supervisor Teahan authorizing continued use of Sheridan "on a strict case by case basis." Pl.'s SOF ¶ 28.

The Davis investigation began on August 27, after Sheridan told the Task Force that Davis sold firearms and drugs from his home at 11 Harold Park in Roxbury. Defs.' SOF ¶ 11; Pl.'s SOF ¶ 2.[3] According to Sheridan, Davis had an AR-15, a .357 caliber pistol, a 9 millimeter pistol, and a .45 caliber pistol. Defs.' SOF ¶ 12. Over the next few weeks, Sheridan represented to the Task Force that he was communicating with Davis about purchasing these weapons.

---

[3] Statements as to what the Task Force was told by Sheridan are uncontroverted. Whether Sheridan's statements themselves were truthful is disputed.

Sheridan stated that he attempted a controlled buy of crack cocaine from Davis on September 7, but that Davis was not home. Defs.' SOF ¶ 13. Sheridan told the Task Force that, on September 9, Davis told Sheridan that he would sell Sheridan the AR-15 and drugs. Id. ¶ 14. Sheridan told the Task Force that on September 11, at Davis's residence, Davis showed Sheridan an AR-15 with an obliterated serial number as well as magazines and ammunition. Id. ¶ 15. Sheridan reported that Davis said he would sell the AR-15 for $4,300.00. Id. Sheridan also stated that Davis showed Sheridan a .32 handgun. Id. Sheridan reported further that when he was at Davis's residence, Sheridan observed multiple people stop by to purchase crack cocaine. Id.

On September 14, Task Force agents reviewed a text message from the number 617-XXX-1779 to Sheridan. Id. ¶ 16. This message asked whether Sheridan still wanted to purchase the AR-15. Id. Sheridan told the Task Force that Davis was using the number 617-XXX-1779. Id. On September 16, Task Force agents reviewed a text message to Sheridan from 617-XXX-1779 that asked "what's good?" Id. ¶ 17. Sheridan called 617-XXX-1779 in the presence of Task Force agents. Id. ¶ 18. After a female answered the phone, Sheridan asked for Davis. Id. The female on the other end stated that Davis was present. Id. Sheridan told the female he would be there shortly. Id. Sheridan hung up, and soon thereafter received a text message from 617-XXX-1779 stating, "3700 now I'll get the rest later." Id. Sheridan responded that he needed to "get those basketballs first," referring to crack cocaine. Id.

Based on Sheridan's purported communications with Davis, the Task Force organized a controlled cocaine purchase for September 16 at 11 Harold Park. Id. ¶¶ 18-19. The Task Force provided Sheridan with an audio-video recording device and $1,000. Id. ¶ 19. McManus positioned himself outside 11 Harold Park, where he was able to watch as Sheridan entered the building. Id. During the purported buy, Sheridan called McManus to say that a black female

would be exiting 11 Harold Park and obtaining the crack cocaine from the building across the street. Id. McManus saw a black female exit 11 Harold Park and run into a residence across the street. Id. McManus watched as this female then returned to 11 Harold Park. Id. Sheridan exited 11 Harold Park, met with Special Agent O'Neil, and produced a small bag of crack cocaine and $320.00. Id. Sheridan told Task Force agents that Davis was inside with two women, one of whom, Kim Poindexter, was the woman who ran across the street during the controlled buy. Id. Sheridan also said Davis had offered to sell what appeared to be a rifle wrapped in paper shopping bags. Id.

On September 22, Sheridan placed a call to a new phone number, 617-XXX-5457, while in the presence of Task Force agents. Id. ¶ 20. Sheridan arranged to meet the person on the other end of this call, whom Sheridan represented was Davis, the following day at 11 Harold Park at 9 a.m. to purchase the AR-15 and drugs. Id.

Based on the information Sheridan provided, McManus, the only Boston Police officer assigned to the Task Force, applied for a "Blood" warrant authorizing one-party consent recordings. Id. ¶¶ 1, 23. The fifteen-day warrant McManus obtained required any audio-video recordings made pursuant to the warrant to be filed in the clerk's office. Pl.'s SOF ¶ 36. McManus also requested funds from the Suffolk County District Attorney's office for the controlled buy. Id. ¶ 37. This was the first time in his career that McManus had obtained funds from a district attorney's office. Id. McManus also applied for and obtained a no-knock anticipatory search warrant to search 11 Harold Park, Apartment 3, Davis's third-floor apartment, along with common stairways and entryways and anyone who may possess any "buy money," following the controlled buy. Id. ¶ 39. McManus's search warrant application stated that the confidential witness would "conduct a transaction whereby the CW delivers $3700 in

buy money to Harold Davis or one of his representatives in exchange for the firearm." Pl.'s Mem. in Support of Mot. for Summ. J. Ex. 22 [#181-22].

On September 23, the morning of the second controlled buy, McManus, other Task Force agents, and Special Weapons and Tactics ("SWAT") team members met at the Special Operations Unit in Roxbury for a briefing on the details of the controlled buy. Defs.' SOF ¶ 36. Sheridan met with Task Force members just prior to the buy. Id. ¶ 38. Sheridan was handed $3,700.00 in marked buy money as well as a duffle bag outfitted with covert surveillance equipment to record the transaction. Id. While in the presence of the Task Force, Sheridan called 617-XXX-5457. Id. ¶ 42. The person on the other end of the line indicated he was at 11 Harold Park and ready for Davis to arrive. Id.

Sheridan left the Task Force and headed toward 11 Harold Park. Id. ¶ 43. McManus was positioned out of sight, where he listened to the audio transmission in real time. Id. ¶¶ 40, 49. McManus believed O'Neil was monitoring the live feed of the video surveillance. Pl.'s SOF ¶ 48. Sheridan later exited 11 Harold Park, called O'Neil, and claimed that he had made the purchase in the third-floor apartment. Defs.' SOF ¶ 50. Sheridan met with Task Force members and provided them with the recording equipment, duffle bag, three plastic bags of cocaine, a Tech-9 (9 millimeter) firearm with an obliterated serial number, a high capacity magazine, and ammunition. Id. ¶ 51. Sheridan told the Task Force agents that he met with Davis in the third-floor apartment and exchanged the $3,700.00 in buy money for the Tech-9, firearm accessories, and cocaine. Id. ¶ 52. Sheridan stated that he was not in any apartment other than Apartment 3 and that he did not speak to anyone other than Davis. Pl.'s SOF ¶ 51. Sheridan told the agents that he was not able to buy the AR-15 as planned because Davis said it was no longer available for the negotiated price, although the Tech-9 was available for $3,000.00. Defs.' SOF ¶ 52.

Within minutes of this debrief, O'Neil told the SWAT team it could make entry. Id. ¶ 54. SWAT entered the property and encountered Davis near the main entryway. Id. ¶ 56.

Soon after SWAT's entry, McManus entered 11 Harold Park and found SWAT securing Davis in the entryway. Id. ¶ 57. McManus searched Davis for contraband and found Davis with $3,573.00 in cash on his person, only $600.00 of which was marked buy money. Id. ¶¶ 58-59. McManus arrested Davis and placed him in a squad car. Id. ¶ 58.

Kevin Poindexter, the resident of the first-floor apartment, has said he was in his bathroom when he saw laser beams and heard police yell "get down, get down." Pl.'s SOF ¶ 72. He exited the bathroom, asked his girlfriend Christina Howard what was going on, saw police surrounding the building, and heard police slam Davis to the ground just outside his apartment door. Id. ¶ 73. When Kevin Poindexter opened the door, police told him to stay in his apartment. Id. ¶ 74. Thirty to forty-five minutes later, police told him he could leave. Id. ¶ 75. Poindexter left 11 Harold Park and says he went to a store. Id. ¶ 76.

After placing Davis in a squad car, McManus went to the third-floor apartment to participate in the ongoing search. Defs.' SOF ¶ 60. This search yielded cocaine residue, plastic bags containing cocaine, a smoking device, a mixer, a strainer, glass tubes, electronic scales, two allegedly fraudulent $100 bills, four bundles of United States currency totaling $389.00, personal papers containing Davis's name, and a cell phone. Id. ¶ 63. No items related to weapons dealing were recovered. Pl.'s SOF ¶ 57. The phone recovered was not connected to any numbers the Task Force had witnessed Sheridan contact during the investigation. Id. ¶ 58.

Following the search of the third-floor apartment, McManus returned to the police station to start the booking process. Defs.' SOF ¶ 66. Sergeant Detective Paul W. Murphy offered to assist McManus, and McManus responded that Murphy could help write an incident report for

the September 16 controlled buy. <u>Id.</u> ¶¶ 67-68. Because Murphy was not present for that buy, McManus supplied him with all information for the incident report. <u>Id.</u> ¶ 69. While at the police station, McManus realized a portion of the buy money was missing, as only $600 of the $3700 in marked buy money supplied to Sheridan had been recovered from Davis. <u>Id.</u> ¶¶ 65, 74. After finishing his paperwork at the station, McManus returned to 11 Harold Park in an attempt to locate the missing buy money. <u>Id.</u> ¶ 75.

Kevin Poindexter, who had left his first-floor apartment, returned to 11 Harold Park after about an hour. Pl.'s SOF ¶ 77. There, he says he encountered a plain clothes police officer. <u>Id.</u> ¶ 78. The identity of this officer is in dispute, but there is no dispute as to what Poindexter told this officer. This officer asked Poindexter his name and how much money he had in his pocket. <u>Id.</u> ¶ 79. Poindexter pulled out about $34. <u>Id.</u> The officer asked Poindexter if he sold a gun to Sheridan, and Poindexter said, "No." <u>Id.</u> ¶ 80. The officer asked Poindexter whether Poindexter sold guns, and Poindexter stated, "No, we don't sell guns. We sell food." <u>Id.</u> Ten officers then surrounded Poindexter, and one officer asked Poindexter where he lived and whether the officers could search his room. <u>Id.</u> ¶ 81. Poindexter provided the officers with permission to search his room, which they then did. <u>Id.</u> ¶¶ 82-83. When the same plainclothes officer who first encountered Poindexter asked about the money again, Poindexter said, "Your money is with Short and Darren [Sheridan]. She just left here before him." <u>Id.</u> ¶ 84. The officer then said "what did you say?" <u>Id.</u> ¶ 85. Poindexter reiterated, "She just left here before Darren." <u>Id.</u> When asked how he knew Sheridan, Poindexter answered, "That's my cousin." <u>Id.</u> At that time, the group of

officers huddled and talked. Id. ¶ 86. Poindexter informed the officers that the bag in which

Sheridan had the gun was still on Poindexter's table. Id.[4]

McManus believes he participated in the search of Poindexter and Howard's apartment.

Id. ¶ 66. Police never recovered the $3100 in missing marked buy money provided to Sheridan

but not found on Davis. Defs.' SOF ¶ 65. Davis was booked by Boston Police, with McManus

listed as the arresting officer on the booking form. Id. ¶¶ 84-85.

McManus drafted an incident report for the September 23 controlled buy. The report

indicates that Sheridan, referred to as "C/W," was equipped with surveillance equipment, and

"stated that he met with Davis in apartment #3 to complete the transaction." Pl.'s Mem. in

Support of Mot. for Summ. J. Ex. 28 [#181-28]. According to the report, Sheridan called a

number belonging to Davis and made arrangements for the purchase of an AR-15 rifle. Id. When

arrested, "Davis was in possession of $3,573, $600 of which was recorded buy money." Id.

Later, the report states, "Davis was found in possession [of] the $3,573.00, which was seized and

returned to the Suffolk Count (sic) District Attorney's Office." Id. The report does not reference

Poindexter. It is dated September 23 at 3:59 p.m. Id.

McManus applied for two separate criminal complaints against Davis. One charged Davis

with distributing a Class "B" controlled substance and distributing a Class "B" controlled

substance within 1000 feet of a school on September 16. Pl.'s Response to Defs.' SOF Ex. E

[#186-5].[5] A second charged Davis with the following offenses occurring on September 23:

---

[4] An investigator working on Davis's behalf later took this bag. This investigator described the bag as a "red and black backpack" rather than a black duffel bag. Pl.'s Mem. in Support of Mot. Summ. J. Ex. 27 ["Christopher Gonzalves Affidavit"] [#181-27].

[5] The criminal complaint for the September 16 conduct will be discussed at length in this court's order on Murphy's Motion for Summary Judgment [#173]. McManus provided his co-worker Murphy with information about the September 16 buy, which Murphy then used to draft an

selling or transferring a large capacity firearm, possessing a firearm with a defaced serial number during a felony, possessing ammunition without a firearm identification card, distributing a Class "B" substance, distributing a Class "B" controlled substance within 1000 feet of a school, possessing with intent to distribute a Class "B" controlled substance, and possessing with intent to distribute a Class "B" substance within 1000 feet of a school. Defs.' SOF Ex. T [#179-20]. Attached to McManus's application for this second criminal complaint was his September 23 incident report. A state-court magistrate found probable cause based on these submissions, and issued the complaints.

In December 2010, McManus testified before the grand jury in support of charging Davis for the offenses arising out of the September 23 controlled buy. He testified Sheridan "had surveillance equipment, electronic equipment on his body." Pl.'s SOF ¶ 102. According to McManus, this equipment "depicts what was going on inside that house." Id. McManus informed the grand jury that he had not watched the video. Id. ¶¶ 103-04. He explained that his testimony as to what happened was based on what O'Neil told him, which in turn was based on what Sheridan told O'Neil after the controlled buy. Id. ¶ 104. When questioned by a grand juror regarding the missing marked buy money, McManus proposed the following theory: "evidently Mr. Davis perhaps gave the money to somebody in the house on -- the first floor." Id. ¶ 108.

---

incident report. That report was then submitted with an application for a criminal complaint based on conduct occurring on September 16. Davis refers to this issue only in one conclusory footnote, in which he acknowledges that he "has not focused on it." Pl.'s Opp'n to McManus's Mot. for Partial Summ. J. 10 n.2 [#185]. As Davis has not relied on the criminal complaint for the September 16 conduct in his arguments for summary judgment against McManus, or in his arguments opposing McManus's motion for summary judgment, no further discussion of that complaint is necessary at this time. In any event, genuine disputes of material fact exist as to whether the September 16 incident report was false and, if so, whether McManus acted deliberately or recklessly in causing such a false report to be drafted and submitted.

McManus did not reveal to the grand jury any details about a discussion with Kevin Poindexter. Id. ¶ 106. Davis was indicted on December 17. Defs.' SOF ¶ 93.

Davis's criminal defense counsel repeatedly requested that the Suffolk County District Attorney's office turn over the video of the September 23 controlled buy. Pl.'s SOF ¶ 4. Davis maintained that he could not possibly appear on the video. Id. ¶ 4. Davis's counsel filed a motion to compel discovery of the video on January 20, 2011, explaining that Sheridan had set up Davis. Id. ¶¶ 5-6.

The District Attorney's office finally turned the video over to Davis's counsel on or about January 25. Id. ¶ 10. Disputes remain about how to interpret what this video depicts, but the following is not disputed. Sheridan can be seen walking into the front lobby of 11 Harold Park. Id. ¶ 114. Sheridan climbs the stairs. Id. ¶ 116. When Sheridan reaches the top of the stairs, the video becomes blurry and then turns dark. Id. When the video becomes clear again, Sheridan seems to knock on a door. Id. ¶ 118. A man appears. Id. This man is not Davis. Id. Over the next few minutes, Sheridan and this other man engage in a transaction. After the transaction concludes, Sheridan leaves the apartment. Id. ¶ 119. Based on the amount of time it takes Davis to reach the outside, it appears he was on the first floor when the transaction occurred. Id. ¶ 120.

After Assistant District Attorney Katherine Hinman viewed the video on January 28, she called the court clerk "to stipulate that it wasn't the defendant on the video." Id. ¶ 12. That day, Davis was released on personal recognizance. Id. ¶ 13. On March 28, the Commonwealth *nolle prossed* the ten-count indictment against Davis. Id. ¶ 14.

Meetings took place between O'Neil and members of the District Attorney's office following the *nolle prossequi*. Id. ¶ 15. On May 18, 2011, Hinman wrote the following email summarizing what she had learned over the preceding months:

I inherited the case from Brian Fahy and it was brought to my attention by the defense atty that it was not Herbert Davis in the video. I spoke with the FBI agent and he again spoke to Darren, who changed his story completely and now is saying it was Kevin Davis (Herbert Davis's) cousin, who sold him the firearm. . . . [A]pparently Darren has a long history of not telling the truth. He was involved in several buys that the US Atty's office was overseeing last summer, and all of them ended up not being indicted because it was decided that Darren was not being truthful. The US Atty's office will no longer work with him.

Pl.'s Mem. in Support of Mot. Summ. J. Ex. 9 [#181-9]. Davis filed this civil rights action in

August 2013, asserting that McManus's conduct violated Davis's rights.

III.    McManus's Motion for Partial Summary Judgment

        a.    False Arrest and False Imprisonment Claims

McManus moves for summary judgment on Counts I and IV. The § 1983 "false arrest"

claim in Count I is based on Davis's "Fourth Amendment right to be free from an unreasonable

seizure." Pena-Borrero v. Estremeda, 365 F.3d 7, 12 n.8 (1st Cir. 2004). Davis's false

imprisonment claim in Count IV requires him to show McManus intentionally and unlawfully

confined Davis, thereby harming him, without "legal justification for the restraint." Diaz v.

Devlin, 229 F. Supp. 3d 101, 110 (D. Mass. 2017). "This is essentially the same as the Fourth

Amendment standard for unlawful arrest." Goddard v. Kelley, 629 F. Supp. 2d 115, 129 (D.

Mass. 2009). Thus, Counts I and IV both turn "upon whether, at the moment the arrest was

made, the officers had probable cause to make it – whether at that moment the facts and

circumstances within their knowledge and of which they had reasonably trustworthy information

were sufficient to warrant a prudent man in believing that the [plaintiff] had committed or was

committing an offense." Beck v. State of Ohio, 379 U.S. 89, 91 (1964).

In this case, Sheridan's representations to police provided the primary basis for Davis's

arrest. When police arrest an individual based "on information from a confidential informant,

'law enforcement must provide some information from which a court can credit the informant's

credibility.'" United States v. Gonsalves, 859 F.3d 95, 103 (1st Cir. 2017) (quoting United States v. White, 804 F.3d 132, 136 (1st Cir. 2015)). Relevant factors include: "(1) the probable veracity and basis of knowledge of the informant; (2) whether an informant's statements reflect first-hand knowledge; (3) whether some or all of the informant's factual statements were corroborated wherever reasonable and practicable; and (4) whether a law enforcement officer assessed, from his professional standpoint, experience, and expertise, the probable significance of the informant's information." Id. at 104 (quoting White, 804 F.3d at 137).

There is a genuine dispute as to when McManus knew of issues that called into question Sheridan's credibility. Davis has introduced evidence demonstrating the extent of Sheridan's past work with McManus, the Task Force's concerns about some aspects of Sheridan's informant work prior to Davis's arrest and limitations on his use as an informant, and McManus's unusual step of seeking buy money from the Suffolk County District Attorney's Office and a warrant from a state court judge for an FBI Task Force operation. A reasonable jury could infer that McManus knew, prior to the arrest, that Sheridan was unreliable and was capable of lying to law enforcement about the controlled buy.

Additionally, there is a dispute as to whether McManus was able to view the real-time video feed, in addition to the audio feed, during the controlled buy, and as to whether McManus retained custody of the recording after the buy concluded. According to Davis, the Boston Police took custody of the recording. Even if McManus was only able to listen to the real-time audio, a dispute also exists as to whether the recorded sounds would have caused a reasonable person to know Sheridan did not make the exchange in the third-floor apartment, contrary to what he told the Task Force.

To be sure, McManus had some corroborating evidence to support his reliance on Sheridan's narrative. McManus knew Davis was present in 11 Harold Park at the time of the buy. That, without more, would not supply probable cause to arrest. McManus also attempts to rely on the $600 of marked buy money found on Davis. That buy money, if considered, likely provided probable cause to believe Davis had engaged in a crime, and thus probable cause to arrest Davis, even if it did not provide probable cause to believe Davis had committed all crimes for which he ultimately was charged. See United States v. Bizier, 111 F.3d 214, 218 (1st Cir. 1997). Yet it is not clear whether McManus knew Davis possessed this money *at the time of the arrest*, or only after arresting Davis, which is critical to this determination.

Probable cause turns on what McManus knew and when he knew it. Numerous disputes remain about when McManus acquired information that eliminated probable cause to arrest. Resolution of many of these disputes will turn on an assessment of McManus's credibility. Accordingly, they are for the jury to decide. See Lewis v. Kendrick, 944 F.2d 949, 952 (1st Cir. 1991); Gutierrez v. MBTA, 772 N.E.2d 552, 561 n.10 (Mass. 2002).

As a final matter, McManus moves for summary judgment on the § 1983 false arrest claim based on qualified immunity. As McManus correctly points out, "with respect to a § 1983 claim that seeks to hold a police officer liable for making a warrantless arrest without probable cause, 'if the presence of probable cause is arguable or subject to legitimate question, qualified immunity will attach.'" Wilber v. Curtis, 872 F.3d 15, 21 (1st Cir. 2017) (quoting Cox v. Hainey, 391 F.3d 25, 31 (1st Cir. 2004)). Viewing the facts in the light most favorable to Davis, as the non-moving party, a jury could infer McManus *knew*, based on his prior working relationship with Sheridan, that Sheridan had lied about the controlled buy, yet arrested Davis based on that

false account. Although not the only inference one could draw from the evidence, it is a reasonable one that would show the absence of even arguable probable cause.

b. Malicious Prosecution Claims

McManus moves for summary judgment on only the federal malicious prosecution claim under § 1983 and not the state-law malicious prosecution claim, arguing that he is entitled to judgment based on qualified immunity. Determining whether an officer is entitled to qualified immunity requires two inquiries. For one, a court must determine "whether the official violated a federal statutory or constitutional right." Wilber, 872 F.3d at 21. The other inquiry is "whether the right was clearly established at the time of the challenged governmental conduct." Id. (internal quotations omitted). McManus rests on the "clearly established" prong of this analysis.

Malicious prosecution causes of action have followed a somewhat confusing path under § 1983. In the past, courts considered such claims potentially actionable under the due process clause. Yet these options have been foreclosed. A "§ 1983 claim for malicious prosecution as a deprivation of procedural due process is barred where, as here, the state's tort law recognizes a malicious prosecution cause of action." Meehan v. Town of Plymouth, 167 F.3d 85, 88 (1st Cir. 1999). Nor is there a "substantive due process right under the Fourteenth Amendment to be free from malicious prosecution." Id. (quoting Roche v. John Hancock Mutual Life Ins. Co., 81 F.3d 249, 256 (1st Cir. 1996)). Yet in rejecting malicious prosecution claims as violations of substantive due process, a plurality of the Supreme Court suggested that such claims might be actionable under the Fourth Amendment. See Albright v. Oliver, 510 U.S. 266, 271 (1994) (plurality opinion). Through the year 2010, the First Circuit had yet to expressly answer "whether a malicious prosecution claim is cognizable under the Fourth Amendment and section 1983." Harrington v. City of Nashua, 610 F.3d 24, 30 (1st Cir. 2010) (internal quotations

omitted). Then, in 2013, the First Circuit confirmed that such a claim is cognizable, holding, "[t]oday, we join our sister circuits in concluding that the Fourth Amendment protection against seizure but upon probable cause does not end when an arrestee becomes held pursuant to legal process." Hernandez-Cuevas v. Taylor, 723 F.3d 91, 99-100 (1st Cir. 2013).

McManus contends that in light of this confusing path, it was not clearly established as of the time of Davis's prosecution that McManus's conduct violated Davis's constitutional rights. As McManus highlights, it was not until Hernandez-Cuevas that the First Circuit expressly grounded a § 1983 malicious prosecution cause of action in the Fourth Amendment. But this answers only whether Davis's cause of action was clear as of 2010. Whether his constitutional right at issue was clearly established depends on whether, "at the time of the officer's conduct, the law was 'sufficiently clear that every reasonable official would understand that what he is doing' is unlawful." District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)). That presents a different question.

Hernandez-Cuevas was not the groundbreaking case McManus makes it out to be. Indeed, the case recognized that it simply "harmonizes [First Circuit] law with the law of other circuits, and makes explicit what has long been implicit in [First Circuit] case law." 723 F.3d at 100. The court noted that "there is now broad consensus among the circuits that the Fourth Amendment right to be free from seizure but upon probable cause extends through the pretrial period." Id. at 99. Further, it observed that "each of the eight Courts of Appeals to directly address . . . whether the Fourth Amendment provides protection against pretrial detention without probable cause has concluded it does." Id. (citing cases through 2010). These statements indicate that there was "a 'consensus of cases of persuasive authority' sufficient to signal to a

reasonable officer that particular conduct would violate a constitutional right." Morse v. Cloutier, 869 F.3d 16, 23 (1st Cir. 2017) (quoting Wilson v. Layne, 526 U.S. 603, 617 (1999)).

Last year, the Supreme Court confirmed that one may bring a Fourth Amendment claim "to contest the legality of his pretrial confinement." Manuel v. City of Joliet, 137 S. Ct. 911, 914 (2017). Tracing this law back four decades, the Court held that a Fourth Amendment violation "can occur when legal process itself goes wrong – when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statements." Id. at 917-18 (citing Gerstein v. Pugh, 420 U.S. 103, 111 (1975) and Albright v. Oliver, 510 U.S. 266, 274 (1994) (plurality opinion)). This answer "follows from settled precedent." Manuel, 137 S.Ct. at 914.

Qualified immunity focuses on the particular conduct at issue. If courts have held "certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand, the officer would not be entitled to qualified immunity based simply on the argument that courts had not agreed on one verbal formulation of the controlling standard." Saucier v. Katz, 533 U.S. 204, 202-203 (2001). This means there is a difference between articulating a precise cause of action that a plaintiff may bring and establishing that certain conduct violates the Constitution. See King v. Harwood, 852 F.3d 568, 580 n.4 (6th Cir. 2017) (distinguishing "recognition of §1983 *claims* from . . . articulation of whether a given right is *clearly established*"); see also Estate of Booker v. Gomez, 745 F.3d 405, 428 (10th Cir. 2014) (holding right to be free from excessive force was clearly established despite uncertainty about whether claim arose under Fourth, Fifth, Eighth, or Fourteenth Amendment).

While courts have struggled at times to identify the precise cause of action for malicious prosecution, it has long been established that a police officer violates the Constitution by intentionally or recklessly making false statements in, or omitting true exculpatory statements

from, materials submitted to a magistrate in support of probable cause. See Franks v. Delaware, 438 U.S. 154, 171 (1978). Hernandez-Cuevas recognized that no reasonable officer "would have been ignorant of the fact that fabricating evidence was constitutionally unacceptable." 723 F.3d at 97 n.7. As of 2004, the First Circuit had held that it is "self-evident" that "those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit." Id. (quoting Limone v. Condon, 372 F.3d 39, 44-45 (2004)). Such conduct did not first become unconstitutional in 2004. Limone even held that "the right not to be framed by law enforcement agents was clearly established in 1967." Id. at 45.

"The 'dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Hernandez v. Mesa, 137 S. Ct. 2003, 2007 (2017) (per curiam) (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)). Viewing the evidence in the light most favorable to Davis, McManus *knew* Sheridan was setting up Davis and even watched this setup occur on video. Then, despite knowing Sheridan's narrative was false, McManus presented it to a magistrate to secure a criminal complaint and to a grand jury to secure an indictment. If these facts are true, no reasonable officer in 2010 would think such conduct was lawful. Of course, it remains in dispute whether this is what occurred. A jury could find McManus did not act with such knowledge or recklessness. But McManus has not shown that, as a matter of law, his conduct did not violate a clearly established right. Accordingly, he is not entitled to qualified immunity on this claim.

IV.    Davis's Motion for Partial Summary Judgment

Davis's motion seeks summary judgment on Counts III and V, the federal and state malicious prosecution claims. A § 1983 malicious prosecution claim requires a plaintiff to prove "the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by

probable cause, and (3) criminal proceedings terminated in plaintiff's favor." <u>Hernandez-Cuevas</u>, 723 F.3d at 101 (citation omitted). A malicious prosecution claim under Massachusetts law requires proof "that the defendant (i) instituted criminal proceedings (ii) with malice and (iii) without probable cause, and (iv) that the proceedings were terminated in the accused's favor." <u>Limone v. United States</u>, 579 F.3d 79, 89 (1st Cir. 2009) (citing <u>Correllas v. Viveiros</u>, 572 N.E.2d 7, 10 (Mass. 1991)).

These claims do not impose strict liability on police officers for making omissions and false statements to magistrates, but instead require a mental state "similar to common law malice." <u>Hernandez-Cuevas</u>, 723 F.3d at 101-02. To prevail on his § 1983 claim, Davis must show that McManus's statements "amounted to 'deliberate falsehood or . . . reckless disregard for the truth.'" <u>Id.</u> at 102 (quoting <u>Franks v. Delaware</u>, 438 U.S. 154, 181-82 (1978)). To prevail on his state-law malicious prosecution claim, Davis must show McManus acted with "improper purpose." <u>Wilber v. Curtis</u>, 872 F.3d 15, 24 (1st Cir. 2017) (quoting <u>Chervin v. Travelers Ins. Co.</u>, 858 N.E.2d 746, 756 (Mass. 2006)).

Davis contends that the undisputed facts show that McManus knew Sheridan was unreliable and ignored critical information pointing to Davis's innocence, yet initiated criminal charges anyway. A reasonable juror certainly may draw this conclusion from the evidence. But reaching this conclusion requires finding material facts in Davis's favor. Viewing the evidence in the light most favorable to McManus, a jury could find that the conduct at issue here amounted only to negligence, which is insufficient to support a malicious prosecution claim. <u>Hernandez-Cuevas</u>, 723 F.3d at 102 (quoting <u>Franks</u>, 438 U.S. at 171).

Genuine disputes exist on the following issues. One is whether McManus was the "plainclothes" officer Poindexter described speaking to after returning to 11 Harold Park from

the store on September 23. Another is when McManus first viewed the video footage of the controlled buy. Further, a dispute exits as to whether McManus knew that Sheridan was not a credible witness prior to September 23, such that it was not reasonable for him to credit Sheridan's account of the controlled buy.

By the time McManus initiated criminal charges against Davis, he had some evidence to corroborate Sheridan's story. For example, Davis was found with $600 of marked buy money within minutes of the controlled buy, and while standing in the entryway to the property where Sheridan had said the controlled buy took place. Further, the search of Davis's apartment yielded evidence of drug dealing. Although evidence of weapons dealing was not uncovered, this did not necessarily eviscerate probable cause, as Sheridan had produced a firearm and accessories following the controlled buy.[6]

A jury could find McManus's failure to provide Kevin Poindexter's narrative to either the magistrate or the grand jury was based on neither a deliberate nor reckless effort to falsify evidence. According to McManus, he had no reason to believe Poindexter. McManus's disbelief is supported by significant holes in Poindexter's narrative. For example, Poindexter's girlfriend, Christina Howard, initially told the Task Force that she did not see or hear anyone on the first floor prior to hearing police execute the search warrant. Yet Poindexter told police that both he and his girlfriend had spoken with Sheridan and Sheridan's wife that morning. Howard later changed her story after Poindexter spoke privately with her and then corroborated his narrative of that morning to the police. Poindexter's account of the exchange he had with Sheridan that

---

[6] Further, Sheridan had informed the Task Force that, after the September 16 controlled buy, Davis called Sheridan sounding very paranoid, stating that he had "cleaned out the house," and noting that he had removed evidence of his weapons and drug dealing from his apartment. Pl.'s Response to Defs.' SOF Ex. 4 [#186-4] ["September 22 FBI Task Force Report"]. It is not clear from the record whether McManus knew Sheridan had told this to the Task Force.

morning also is not consistent with the audio recorded during the controlled buy, which McManus was listening to in real time. Nor is Poindexter's statement that Short was present corroborated by the audio or other evidence. Further, Poindexter told police that he saw Davis that morning at 8 a.m., did not otherwise see Davis, and that just after Sheridan left Poindexter's apartment, the police arrived. This account conflicts with the $600 in buy money found on Davis.

Armed with the knowledge that the man who appears in the video of the controlled buy is not Davis, it is easy to look back at the events that transpired and see suspicious behavior. Yet the probable cause inquiry "is not to be undertaken from the perspective of hindsight but from the perspective of a hypothetical 'reasonable man' standing in the reporting person's shoes at the time when that person acted." Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 254 (1st Cir. 1996). "When an arresting officer has the benefit of an apparently credible eyewitness account, the amount of arguably exculpatory evidence must be substantial before further investigation can be required as a constitutional matter." Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 11 (1st Cir. 2004).[7] There is evidence from which a reasonable jury could conclude that McManus had no reason to doubt Sheridan's account until viewing the video, and that McManus did not view the video until after filing the application for the criminal complaint and testifying before the grand jury. Therefore, a reasonable jury could conclude that McManus acted neither deliberately nor recklessly in providing Sheridan's account of the controlled buy to the magistrate and in concluding Davis had committed the offenses charged.

---

[7] Davis also relies in part on United States v. Tanguay, 787 F.3d 44, 52 (1st Cir. 2015), which recognized an exception to the general rule that once an officer has probable cause, there is no further duty to verify the accuracy of that information or investigate further. An officer has such a duty to investigate further when she has "knowledge of an obvious and unexplored reason to doubt the truthfulness of the allegations." Id. at 53. For the reasons stated above, the court does not find as an undisputed fact that McManus possessed information giving rise to such doubt.

V.      <u>Conclusion</u>

For the foregoing reasons, McManus's <u>Motion for Partial Summary Judgment</u> [#177] and

Davis's <u>Motion for Partial Summary Judgment</u> [#180] are DENIED.

IT IS SO ORDERED.

March 28, 2018                                                    /s/ Indira Talwani
                                                                          United States District Judge