UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| HERBERT DAVIS, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 13-cv-11900-IT |
| | * | |
| PAUL W. MURPHY, STEPHEN M. | * | |
| MEADE, and STEPHEN C. McMANUS, | * | |
| | * | |
| Defendants. | * | |

## MEMORANDUM & ORDER ON DEFENDANT PAUL W. MURPHY'S MOTION FOR SUMMARY JUDGMENT

March 28, 2018

TALWANI, D.J.

The above-captioned civil rights action is described in some detail in the court's Memorandum & Order on Cross-Motions for Summary Judgment [#195]. Now before the court is Defendant Sergeant Detective Paul W. Murphy's Motion for Summary Judgment [#173] seeking summary judgment on all claims against him. Plaintiff Herbert Davis opposes summary judgment on three claims: (1) a § 1983 claim based on fabrication of false inculpatory evidence and failure to disclose exculpatory evidence (Count II), Am. Compl. ¶¶ 54-59 [#108]; (2) a § 1983 malicious prosecution claim (Count III), Am. Compl. ¶¶ 60-65; and (3) a malicious prosecution claim under Massachusetts law (Count V), Am. Compl. ¶¶ 69-72.[1] For the reasons that follow, Murphy's Motion for Summary Judgment [#173] is ALLOWED.

---

[1] Davis does not oppose summary judgment on two counts: (1) a § 1983 false arrest claim (Count I), Am. Compl. ¶¶ 49-53; and (2) a false imprisonment claim under Massachusetts law (Count IV), Am. Compl. ¶¶ 66-68. See Pl.'s Opp'n to Def. Paul Murphy's Mot. Summ. J. 1 n.1 [#187].

I.      Standard

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' if 'the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.'" Cherkaoui v. City of Quincy, 877 F.3d 14, 23-24 (1st Cir. 2017) (quoting Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). "Facts are material when they have the 'potential to affect the outcome of the suit under the applicable law.'" Id. at 23 (quoting Sanchez, 101 F.3d at 227). "At the summary judgment stage, [a court] must draw all reasonable inferences from the record in the light most favorable to the nonmoving party, disregarding any 'conclusory allegations, improbable inferences, and unsupported speculation.'" McGrath v. Tavares, 757 F.3d 20, 25 (1st Cir. 2014) (quoting Alicea v. Machete Music, 744 F.3d 773, 778 (1st Cir. 2014)).

II.     Background

Viewing the evidence in the light most favorable to Davis, as the non-movant, the relevant facts supported by the record are as follows.[2] Murphy is a Boston Police officer. Defs.' Statement of Undisputed Material Facts ["Defs.' SOF"] ¶ 1 [#179]; Pl.'s Response to Defs.' Statement of Undisputed Material Facts ["Pl.'s SOF Response"] ¶ 1 [#186]. Either on the morning of September 23, 2010, or the night prior, Murphy's superior, Lieutenant Detective Stephen Meade, assigned Murphy to assist with a controlled buy organized by a Federal Bureau of Investigation ("FBI") Drug and Gang Task Force ("Task Force"). Defs.' SOF ¶ 32.

Task Force members planned for the controlled buy to take place at 11 Harold Park in Roxbury, which was located within the area to which Murphy's Drug Control Unit was

---

[2] This background section relays only those facts that are material to the claims against Murphy.

2

assigned. Id. ¶ 34. Because the buy was to be located within Murphy's assigned district, Meade asked Murphy to bring members of Murphy's unit to the buy location to serve as backup during the buy and to assist, if necessary, in the execution of a search warrant at the property. Id. ¶ 34. Prior to receiving this assignment, Murphy was unaware of the Task Force investigation of which the controlled buy was a part, and had never heard of Darren Sheridan, the informant whom the Task Force relied on to execute the controlled buy. Id. ¶ 33.

A Task Force briefing on the controlled buy took place the morning of September 23 at the Special Operations Unit in Roxbury. Id. ¶ 36. Murphy attended this briefing. Id. During the controlled buy, Murphy was positioned in a squad car on a nearby street. Id. ¶ 44. Murphy did not listen to or view the recording of the controlled buy, nor did he know that a camera was used during the buy. Id. ¶¶ 39, 91. At the conclusion of the buy, Murphy heard over the radio that the Special Weapons and Tactics ("SWAT") team was entering 11 Harold Park to secure the premises. Id. ¶ 55. Law enforcement officers arrested Davis and found him in possession of some, but not all, of the buy money supplied to Sheridan. Id. ¶¶ 58-59. Murphy did not participate in the arrest.

When the buy concluded, Murphy and Meade went to the Special Operations Unit. Id. ¶ 61. Murphy then returned to 11 Harold Park to assist in the ongoing search alongside members of his Drug Control Unit and the Task Force. Id. ¶¶ 61-62. After the search, Murphy traveled to the station with Stephen McManus, the sole Boston Police Officer on the FBI Task Force. Id. ¶¶ 1, 67. Once there, Murphy asked whether he could do anything to assist McManus. Id. ¶ 68. McManus responded that Murphy could help by writing an incident report for another controlled buy that the Task Force had supervised between Sheridan and Davis on September 16. Id.

McManus supplied Murphy with the information for this report. Id. ¶ 71. Murphy then drafted a Boston Police incident report that stated:

> O/S-On 09-16-2010, Det. Steven McManus of the Boston Police DCU/FBI squad, along with members of the FBI, conducted a drug investigation at 11 Harold Pk., apt. #3, Rox. At about 18:00 hours this date, these investigators conducted a purchase of three plastic bags of crack cocaine from the above listed suspect (Herbert Davis) with the assistance of a Cooperating Witness (CW) who made the actual buy.
>
> The CW paid suspect Davis $640.00 USC in funds supplied by the government and in return, was handed the three P/B's of crack cocaine by Herbert Davis. Drugs seized in this incident were secured by FBI Special Agents.
>
> Davis shall be charged with the crimes of Distribution Class "B" & Distribution Class "B" (SZ). This incident transpired within 1000' of the Lewis School, located on Walnut Avenue, Roxbury.

Defs.' SOF Ex. P [#179-16]. Murphy's name appears as both the reporting officer and the approving supervisor. Id. The report is dated September 23 at 2:45 p.m. Id.

Unbeknownst to Murphy, on the morning of September 22, FBI Special Agent Ryan O'Neil had drafted a separate report of the September 16 buy. Defs.' SOF Ex. H [#179-8]. O'Neil's report states, as relevant here, that on September 16, a confidential human source, later identified as Sheridan, reported that when he entered 11 Harold Park, he went upstairs to Apartment 3, and there found both Davis and Kim Poindexter. Id. Sheridan reported that "Davis assumed [Sheridan] was there to purchase the rifle and told [Sheridan] 'there it is', indicating toward a long package, similar in length to a rifle, that was wrapped in paper shopping bags, and leaning against a wall in the apartment." Sheridan reported further that he believes the package contained the AR-15, but did not open the package or see the AR-15." Id. Sheridan reported that he "told Kim and Davis that [Sheridan] needed to purchase and then resell crack cocaine first in order to make the money to buy the rifle. Davis seemed nervous and suspicious about this, and seemed to avoid getting involved in the crack cocaine transaction." Id. Sheridan reported that he

4

paid Poindexter $640.00 for the crack cocaine, and that Poindexter handed Sheridan cocaine. Id. According to Sheridan, "Davis was present during the crack transaction but did not handle the money nor the drugs." Id. The report further states:

> At 7:00 p.m., [Sheridan] called SA O'Neil and advised that Davis had contacted him/her and advised that he had to leave the residence and would not be able to sell the AR-15 that evening. Davis seemed very paranoid and told [Sheridan] that he 'cleaned out the house' indicating to [Sheridan] that he removed anything he did not want to be caught with, such as drugs or firearms. [Sheridan] believes Davis is paranoid due to the high volume of drug traffic at 11 Harold Park.

Id. There is no evidence in the record that Murphy either knew of or read this FBI report prior to drafting his report of the September 16 incident for McManus.

Murphy testified that he drafted his report based *solely* upon information supplied by McManus. Defs.' SOF Ex. C 42:6 [#179-3] [hereinafter "Murphy Dep."]. After drafting the report, Murphy had no further involvement with the Davis investigation or the criminal prosecution against Davis. Defs.' SOF ¶ 73. Murphy was not made aware of any issues with Davis's arrest. Id. He did not hear about the investigation again until the present lawsuit was filed. Murphy Dep. 55:18-21.

McManus filed two Applications for a Criminal Complaint with the Roxbury District Court on September 24. Pl.'s SOF Response Ex. E [#186-5]. The First Application accused Davis of: (1) "Distribution of a Class 'B' Substance" and (2) "Distribution CI 'B' W/I 1000' of School." Id. Both offenses occurred on September 16, according to the Application. Id. McManus's signature appears in the box for "Complainant's Signature." Id. A clerk-magistrate signed at the bottom of the Application, confirming a finding of probable cause for both offenses. Id. According to the Application, this finding of probable cause was "based on facts set forth in attached statement(s)." Id. Although the Application states that it consists of two pages, Davis only filed the first page in the record. Id. Regardless, Davis asserts, and Murphy does not

5

dispute, that McManus submitted Murphy's report of the September 16 incident with the Application.

McManus's second Application for a Criminal Complaint filed on September 24 was based on conduct alleged to have occurred during the September 23 controlled buy. The Roxbury District Court issued a separate complaint based on these offenses. Davis was indicted in December 2010. In late January 2011, prosecutors decided to release Davis from custody and drop the criminal case against him after it was revealed that the video of the September 23 controlled buy showed that the buy did not occur as Sheridan had described it, and therefore did not occur as McManus had described it in his Application for a Criminal Complaint. *Nolle prosequi* was entered on March 28, 2011, disposing of the criminal case against Davis.[3]

III.    Section 1983 Due Process Claim

In Count II, Davis alleges Murphy fabricated a claim that Sheridan was involved in a transaction with Davis by drafting a report that omitted exculpatory evidence and falsely stated that Sheridan in fact engaged in a transaction with Davis. Am. Compl. ¶¶ 54-59. As the First Circuit has held, "if any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit." Limone v. Condon, 372 F.3d 39, 44-45 (1st Cir. 2004). Further, the First Circuit has noted that "[a]ctions taken in contravention of this

---

[3] These issues with the charges against Davis based on the September 23 buy are provided only as general background, because they are not material to the claims against Murphy. This court will explore them more thoroughly in relation to Davis's claims against McManus.

6

prohibition necessarily violate due process (indeed, we are unsure what due process entails if not protection against deliberate framing under color of official sanction)." Id. at 45.

To make out this due process claim, Davis must show either deliberate or reckless conduct in inclusion of false inculpatory material or exclusion of exculpatory material from the information submitted to a magistrate. See Burke v. Town of Walpole, 405 F.3d 66, 82 (1st Cir. 2005). "Reckless disregard for the truth . . . may be established where an officer 'in fact entertained serious doubts as to the truth of the allegations' or where 'circumstances evince[d] obvious reason to doubt the veracity of the allegations' in the application." Id. at 81 (quoting United States v. Ranney, 298 F.3d 74, 78 (1st Cir. 2002)). Further, any false inculpatory evidence or omitted exculpatory evidence must be material. See id. at 82.

Davis contends that the most important factor here is that Murphy drafted a false report "that directly contradicts the contemporaneous FBI report, and was written in a manner that was designed to implicate [Davis]." Pl.'s Opp'n to Murphy's Mot. Summ. J. 6. Absent any evidence that Murphy *knew* of the FBI report, however, that report is irrelevant as to claims against Murphy. It is undisputed that Murphy first learned of the Davis investigation just before the controlled buy, and that Murphy learned all information about the September 16 buy from McManus. Any contradictions between Murphy's report and the FBI's report are beside the point. To the extent Davis argues that Murphy's report was "designed to implicate" Davis, the record does not show that Murphy designed the report for that purpose. Instead, the report shows that it was designed to charge Davis with a crime that Murphy reasonably believed Davis had committed, based on the facts available to Murphy at the time. Murphy's actions regarding the report do not violate due process.

7

Next Davis contends that "the report was written during the period of time that a reasonable officer would have questioned the information that had been provided by Darren Sheridan." Pl.'s Opp'n to Murphy's Mot. Summ. J. 6. Once again, however, Davis fails to show that any of the information pertaining to issues with Sheridan's credibility was available to Murphy. Nothing in the record supports Davis's claim that Murphy was aware of the missing buy money, problems with Sheridan's prior work as an informant, or any other problems with Sheridan's account of the controlled buy. Thus, nothing in the record indicates Murphy in fact doubted or had obvious reasons to doubt the report supplied to him by McManus.

Finally, Davis contends that "[t]he fact that Murphy, who was not involved in the September 16 controlled buy, wrote the report, suggests some attempt to cloud accountability for the facts." Pl.'s Opp'n to Murphy's Mot. Summ. J. 6. Whether McManus made the request "to cloud accountability for the facts" may be relevant to claims against McManus. As to Murphy, however, the undisputed record is that he wrote the report at McManus's request, and that it is not unusual to write an incident report based on dictation from another police officer. Murphy Dep. 52:1-7. Further, Murphy's report does not state that Murphy was present for the events described, but rather that "Det. Steven McManus" and other law enforcement officers were present for the controlled buy.

Because Davis has adduced no evidence supporting his claim that Murphy intentionally or recklessly drafted a report that falsified the evidence relating to the September 16 controlled buy, Murphy is entitled to summary judgment as to Count II.

IV.    Section 1983 Malicious Prosecution Claim

A plaintiff bringing a § 1983 claim for malicious prosecution must show "the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause,

and (3) criminal proceedings terminated in plaintiff's favor." Hernandez-Cuevas v. Taylor, 723 F.3d 91, 101 (1st Cir. 2013) (quotation omitted). To succeed, "the plaintiff must demonstrate that – despite the magistrate's determination that the evidence presented was, on its face, sufficient to establish probable cause – that evidence was, in fact, constitutionally unacceptable because the officers formulated evidence essential to the probable cause determination with a mental state similar to common law malice." Id.

Davis's sole argument opposing summary judgment on this claim is that "a reasonable jury could conclude that in the context in which it was done, Murphy knowingly drafted a false report directly implicating the Plaintiff in order to ensure that there would be probable cause for at least one of the charges against Plaintiff." Pl.'s Opp'n to Murphy's Mot. Summ. J. 7. This is the same argument Davis presented as to Count II. It is unavailing on this claim as well.

In setting forth the elements of a § 1983 malicious prosecution claim in Hernandez-Cuevas, the First Circuit analogized to the standard of "deliberate falsehood or . . . reckless disregard for the truth" from Franks v. Delaware, 438 U.S. 154, 171 (1978). See Hernandez-Cuevas, 723 F.3d at 102. As the First Circuit acknowledged, "Franks . . . did not establish strict liability for police officers. To show the evidence presented to the magistrate was not 'truthful' in the Franks sense, '[a]llegations of [police] negligence or innocent mistake are insufficient." Id. at 102 (quoting Franks, 438 U.S. at 171). In light of Davis's lack of any record evidence showing Murphy knowingly or recklessly drafted a false or misleading report, Davis has not shown Murphy acted with the requisite mental state for a § 1983 malicious prosecution claim.

V.  Malicious Prosecution Claim Under Massachusetts Law

Finally, Murphy seeks summary judgment on Count V, which alleges malicious prosecution in violation of state law. "To prevail on a malicious prosecution claim under

9

Massachusetts law, a suitor must prove that the defendant (i) instituted criminal proceedings (ii) with malice and (iii) without probable cause, and (iv) that the proceedings were terminated in the accused's favor." Limone v. United States, 579 F.3d 79, 89 (1st Cir. 2009) (citing Correllas v. Viveiros, 572 N.E.2d 7, 10 (Mass. 1991)). Murphy has shown he is entitled to summary judgment on this claim because Davis has not met the malice element, as Davis has failed to point to any evidence in the record that could support a finding that Murphy "had an 'improper purpose' in taking the action that he did, notwithstanding that proof of such a purpose is an essential 'element of malicious prosecution.'" Wilber v. Curtis, 872 F.3d 15, 24 (1st Cir. 2017) (quoting Chervin v. Travelers Ins. Co., 858 N.E.2d 746, 756, 758 (Mass. 2006)).

VI. Conclusion

For the foregoing reasons, Murphy's Motion for Summary Judgment [#173] is ALLOWED.

IT IS SO ORDERED.

March 28, 2018 /s/ Indira Talwani
United States District Judge