UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| HERBERT DAVIS, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 13-cv-11900-IT |
| | * | |
| STEPHEN C. McMANUS, | * | |
| In his individual capacity, | * | |
| Defendant. | * | |

MEMORANDUM & ORDER

March 19, 2020

TALWANI, D.J.

Following a drug and firearms investigation using a confidential informant, Plaintiff

Herbert Davis was arrested in his home in Roxbury, Massachusetts. The arresting officer sought

a criminal complaint the following day, and Davis was charged with both drug and gun crimes.

Davis remained in custody on high bail for four months until a Superior Court judge reviewed

the video of the purported firearm transaction—a video which shows a man that is not Davis

conducting the transaction—and released him. The Commonwealth subsequently filed a *nolle

prosequi*, dismissing all charges against Davis.

Davis brought this action alleging violations of 42 U.S.C. § 1983 and state law. The case

proceeded to trial against Boston Police Officer Stephen McManus. After a nine-day trial, the

court denied cross-motions for judgment as a matter of law without prejudice to renewed

motions post-trial, and submitted the case to the jury. The jury entered a verdict in favor of

McManus on all counts.

Now before the court is Davis's <u>Renewed Motion for Judgment as Matter of Law or Alternatively for a New Trial Pursuant to Fed. R. Civ. P. 50 and 59</u> [#309] seeking judgment as a matter of law, or in the alternative, a new trial as to his § 1983 claims. The court denies the motion for judgment as a matter of law. The court also denies the motion for a new trial based on Plaintiff's § 1983 claim for false arrest, but grants a new trial on his § 1983 malicious prosecution claim.

## I.    FACTS

Drawing all inferences in favor of the Defendant, the facts presented at trial are as follows:

### A.  <u>Background Facts Regarding McManus and the FBI Task Force</u>

McManus is a detective with the Boston Police Department ("BPD"). In 1995, McManus was assigned to the BPD's Bureau of Investigative Services, Drug Control Unit. [#312-5 at 1]. In 2008 or 2009, McManus was assigned to the FBI Gun and Drug Task Force ("FBI Task Force"). [#291 at 10:20-24]. FBI Special Agent Ryan O'Neil was also assigned to the FBI Task Force. <u>Id.</u> at 12:7-8. McManus and O'Neil's direct supervisor within the Task Force was FBI Special Agent Richard Teahan. [#300 at 65:20-21].

### B.  <u>The Confidential Informant</u>

In April 2010, the FBI Task Force began to use a confidential informant named Darren Sheridan. Sheridan's handler was Special Agent O'Neil. McManus first met Sheridan in April 2010. Over the next few months, McManus interacted with Sheridan seventeen times. [#291 at 28:6-9].

At some point between April and August 2010, Special Agent Teahan was informed that Sheridan had engaged in illegal drug transactions. [#291 at 30:9-17]. Special Agent Teahan

thereafter authorized the FBI Task Force to use Sheridan in future operations on a "strict case-by-case basis." McManus learned of Sheridan's limited designation from Agent O'Neil, and was aware at the time of the events at issue here that at least one investigation had been interrupted and one terminated as a result of Sheridan's unauthorized behavior. [#292 at 6:1-4].

### C. **The Confidential Informant's Allegations of Gun and Drug Crimes**

On August 27th, Sheridan told FBI Task Force members that an arms trafficker, identified by Sheridan as "Bill," stored firearms and ammunition in a storage unit rented by a woman named Kim Poindexter.[1] [#312-12]. Sheridan identified Kim Poindexter's residence as 11 Harold Park, Apartment 3, in Roxbury. Id. Sheridan provided the Task Force members with the phone number 617-XXX-5457 for Kim Poindexter. Id.

On August 30th, Sheridan told the FBI Task Force members that Davis had acquired firearms from "Bill," and that the firearms were hidden in Davis's home at 11 Harold Park, Apartment 3, in a duffle bag in a bedroom closet. [#312-13]. Sheridan also said that Davis owned and operated a food truck business and that Davis sold crack cocaine in addition to food from his food trucks. Id.

### D. **Independent Efforts to Verify Confidential Informant's Information**

Sheridan identified RMV photos of Kim Poindexter and Davis and officers checked commercial and RMV databases to verify that Davis did live at 11 Harold Park, Apartment 3.[2] [#312-5 ¶ 9]. Another agent conducted surveillance and observed Davis standing near one of food trucks.

---

[1] Kim Poindexter is identified in documents and by witnesses at various times as Kim Poindexter and Kim Poindexter-Davis.

[2] The RMV database listed Davis's residence as 5 Winthrop Street but also showed that Davis's wife and daughter lived at 11 Harold Park, Apartment 3. Commercial databases showed Davis's residence as 11 Harold Park, Apartment 3. [#312-5 ¶ 9].

**E.  <u>The Attempted Controlled Drug Purchase</u>**

On September 7th, the FBI Task Force attempted a controlled crack cocaine purchase from Davis using Sheridan to conduct the purchase. [#312-14]. Before initiating the operation, the Task Force members searched Sheridan, and the FBI provided him with $50 of buy money, and wired him with a transmitter. <u>Id.</u> During the operation, McManus conducted surveillance of 11 Harold Park. <u>Id.</u> McManus observed Sheridan enter and exit the building and heard him talking via the transmitter. <u>Id.</u> After Sheridan rejoined the agents, Sheridan told the agents that no one was home. <u>Id.</u> Sheridan said he called Davis's daughter who told him that they were "night people" and did not often get out of bed until the afternoon or evening. <u>Id.</u> Sheridan returned the $50 to the Task Force. <u>Id.</u>

**F.  <u>The Confidential Informant's Further Allegations of Gun and Drug Crimes</u>**

On September 14th, Sheridan met with members of the FBI Task Force, including McManus. [#312-15]. Sheridan stated to them that he had met with Davis twice in the prior week. Sheridan claimed that on September 9th Davis had indicated that he had an AR-15 rifle and crack cocaine for sale. Sheridan claimed further that on September 11th Davis showed Sheridan an AR-15 rifle and told him that the rifle cost $4,300. <u>Id.</u> Sheridan told the Task Force members that while he was at Davis's residence, Sheridan saw numerous people buying crack cocaine and that Davis was present. Sheridan also told them that Davis cooked the crack cocaine in his apartment. <u>Id.</u> Sheridan showed the Task Force members a text message that he received on the morning of September 14th from the number 617-XXX-1779. Sheridan told the agents that this number belonged to Davis. The text asked Sheridan if he still wanted to buy the AR-15. <u>Id.</u>

## G.  The "Blood" Warrant

On September 16th, McManus applied for a Blood warrant at Suffolk Superior Court to record conversations between Sheridan and Davis.[3] [#312-5]. This was the first time McManus had ever applied for a Blood warrant. McManus advised the judge that he was assigned to the Boston Police Department's Bureau of Investigative Services, Drug Control Unit, but made no mention of his position with the FBI Task Force and made no mention of the FBI's limitation on Sheridan's use or that McManus was not Sheridan's handler. Id. He referred to Sheridan as a "cooperating witness" in an investigation and described an interview with Sheridan by members of the Boston Police Department and the Federal Bureau of Investigation. McManus restated that Sheridan had told them that Davis possessed guns, cooked crack cocaine in his apartment, and sold the crack cocaine from his food truck. McManus asserted in the application that there was probable cause to believe that Davis was operating an illegal firearm trafficking organization and/or cocaine distribution organization.

The Superior Court judge hearing the application found probable cause to believe that Davis was involved in a cocaine distribution organization, and issued the Blood warrant. [#312-8]. The subsequent Court Order and Warrant granting McManus's application was based on the drug allegations and made no finding of probable cause as to the illegal firearm trafficking organization. Id. The judge ordered that "any recording made in compliance with this order shall

---

[3] Under Commonwealth v. Blood, 400 Mass. 61 (1987), a warrant is required pursuant to art. 14 of the Massachusetts Declaration of Rights, for surreptitious recording of oral communication in a private home even if it comes within the "one-party consent" exception of G.L. c. 272, § 99(B)(4) and (C)(1).

be submitted to me together with the return filed . . . and deposited with the clerk of the Chief Justice of the Superior Court." Id.[4] McManus did not comply with this Order.

### H. **The Controlled Drug Purchase**

Also on September 16th, Task Force members reviewed a text exchange between Sheridan and the 617-XXX-1779 number that Sheridan had represented as Davis's. [#312-16]. Sheridan called 617-XXX-1779 in the presence of Task Force agents. Id. A female answered the phone, and Sheridan asked if Davis was there. Id. The female on the other end stated that Davis was there, and Sheridan told the female he would be there shortly. Id. Sheridan hung up, and soon thereafter received a text message from 617-XXX-1779 stating, "3700 now I'll get the rest later." Id. Sheridan responded that he needed to "get those basketballs first." Id.

The FBI Task Force organized a controlled cocaine purchase for later that day at 11 Harold Park. Id. The FBI Task Force provided Sheridan with an audio-video recording device and $1,000 of FBI funds. Id. McManus positioned himself outside 11 Harold Park. Id. At 5:24 p.m. McManus observed Sheridan enter the building. Id. At 5:26 p.m., McManus heard via the transmitter "4," "6," "700." Id. Two minutes later, McManus heard via the transmitter the sound of someone knocking on the door. Id. At 5:33 p.m., McManus observed an unknown black female exit 11 Harold Park. Id. McManus observed the woman return to 11 Harold Park. Id. McManus then heard via the transmitter a discussion regarding "balls" or "eight balls." Id. At 5:36 p.m., McManus observed Sheridan exit 11 Harold Park. Id. Sheridan thereafter returned to the designated meeting point and produced to Agent O'Neil a clear plastic baggie containing a chunky white substance, which was later confirmed to be cocaine. Id. Sheridan gave Agent

---

[4] Mass. Gen. Laws ch. 272 § 99(M)(d) requires that recordings made pursuant to a warrant under this section be returned to the judge who issued the warrant.

O'Neil the cocaine and returned to him $320 of the buy money and the audio/visual equipment. Id.

### I.   **The Confidential Informant's Further Allegations of Gun and Drug Crimes**

During debriefing following this controlled buy, Sheridan reported that Davis was inside 11 Harold Park with two women, one of whom, Kim Poindexter, ran across the street in order to get the drugs for the buy. Id. Sheridan also said that Davis had offered to sell him what appeared to be a rifle wrapped in paper shopping bags. Id. This conversation was not recorded on the audio/visual equipment provided by the FBI to Sheridan, however, and the FBI report states that the audio/visual equipment "malfunctioned" such that only a brief excerpt of the start and end of the drug buy was "salvageable." Id.

Later that evening, Sheridan called Agent O'Neil and stated that Davis had called Sheridan and "seemed very paranoid." Id. Sheridan stated that Davis told Sheridan that he would not be able to sell the AR-15 rifle that evening and that he "cleaned out the house," which Sheridan understood to mean that Davis removed anything he did not want to be caught with, such as drugs or firearms. Id.

### J.   **The Procurement of Funds and a Search Warrant**

On September 17th, McManus requested $3,700 from the Suffolk County District Attorney's Office in order to facilitate a controlled buy of the rifle from Davis. Tr. Ex. 49. The request identifies an "ongoing narcotics / firearms investigation by the Boston Police Department and Suffolk County District Attorney's Office" and makes no mention of the FBI Task Force. Id.

On September 22, 2010, McManus applied for a search warrant from Suffolk Superior Court to search for evidence related to cocaine distribution and the sale of firearms at 11 Harold Park, Apartment 3, and on the person or in the possession of Davis or Kim Poindexter. [#312-4]. He asserted that there was probable cause to believe that Davis and Kim Poindexter were

engaged in illegal drug distribution and illegal sales of firearms. As with the Blood warrant application, this application stated that McManus was assigned to the Boston Police Department's Bureau of Investigative Services, Drug Control Unit, but made no mention of his position with the FBI Task Force and made no mention of the FBI's limitation on Sheridan's use or that McManus was not Sheridan's handler. Id. ¶ 1. McManus again referred to Sheridan as a "cooperating witness" in an investigation and described an interview with Sheridan by members of the Boston Police Department and the Federal Bureau of Investigations. Id. ¶ 4. McManus restated what Sheridan had told them about Davis possessing guns, cooking crack cocaine in his apartment, and selling the crack cocaine from his food truck. Id. ¶¶ 5-6.

McManus also reported on an exchange of text messages "regarding the purchase of the AR-15, the final of which from DAVIS stated '3700 now I'll get the rest later.' indicating he was willing to accept $3700 up front for the AR-15, and would collect the additional funds later," and that "DAVIS instructed [the confidential witness] to come to the residence." Id. ¶ 16. McManus reported further on a "recorded telephone call to DAVIS at (617) XXX-1779," in which the speaker "indicated he understood" that the confidential witness was en route for the purchase. Id. ¶ 17.

McManus included in the application that the confidential witness was given both a "transmitter, and a concealed audio/video recording device," and then relayed the details about the drug transaction as described above, including Kim Poindexter's role in procuring the drugs, and the statements concerning the drug buy heard through the audio transmitter. Id.

McManus reported further that the confidential witness had again discussed purchasing the rifle from Davis and that "DAVIS indicated that he still wanted to sell the rifle to [the

confidential witness], and instructed [the confidential witness] to contact him" when ready to make the purchase. Id. ¶ 16.

The warrant authorized McManus to search Apartment 3 and to search Davis and Kim Poindexter following a controlled buy. Id. at 13-14.

### K. **The Confidential Informant's Further Allegations of Gun and Drug Crimes**

Also on September 22nd, Sheridan placed a call to phone number, 617-XXX-5457, while in the presence of agents. [#312-17]. Sheridan identified the person on the other end of the call as Davis. Id. On the call, Sheridan confirmed a purchase for the following day. Id. McManus was not present for this call. Id.

### L. **The Controlled Buy of Drugs and a Firearm**

On September 23rd, McManus met with other members of the FBI Task Force as well as the Boston Police Department SWAT team to coordinate the controlled buy of drugs and a firearm. [#312-18]. After the meeting, Agent O'Neil wired Sheridan with a camera and an audio device and gave Sheridan $3,700 in buy money and a black duffel bag. Id. McManus placed himself in a vehicle out of sight near 11 Harold Park. Id.

Sheridan entered 11 Harold Park and exited several minutes later. Id. Sheridan returned to Agent O'Neil with the duffel bag carrying ammunition, three bags of crack cocaine, one semi-automatic pistol, and one high-capacity magazine. Id. Sheridan stated that he understood Davis was selling him the gun for $3,000 and the crack cocaine for $700. Id. Agent O'Neil informed McManus that Sheridan had completed the transaction with Davis in Apartment 3 at 11 Harold Park. Id.

## M. <u>The Arrests and Search</u>

After Agent O'Neil received the items from Sheridan, the SWAT team entered 11 Harold Park pursuant to the search warrant, followed by McManus. McManus testified that by the time he entered the property, Davis was secured in the front hallway of the building. McManus placed Davis under arrest and searched him, discovering $3,573 on his person.

At some point, Kevin Poindexter, a resident of Apartment 1 on the first floor of 11 Harold Park, left the building. [#292 at 110:23-111:4]. McManus performed a pat frisk of Kevin Poindexter before he left. <u>Id.</u>

Later that day, McManus went to the police station to assist in Davis's booking process. While at the police station, McManus realized that only $600 of the $3,573 found on Davis was marked buy money. McManus then returned to 11 Harold Park to search for the remaining buy money. McManus participated in the ongoing search of Davis's apartment. Davis's wife, Dedrea Poindexter Davis, and Kim Poindexter were present for the search. Two plastic bags of crack, a scale, some plastic baggies and some cash were seized from Apartment 3. McManus did not find any guns, gun paraphernalia or the phones associated with the phone numbers Sheridan had previously called in Apartment 3. <u>Id.</u> at 45:20-46:5.

When McManus could not find the remaining $3,100 of buy money in Apartment 3, he went down to the first floor with Agent O'Neil, where they met Tina Howard. Howard lived in Apartment 1 on the first floor of 11 Harold Park with Kevin Poindexter. Howard told McManus and Agent O'Neil that she had no knowledge of any gun or money and that no one was in her apartment that morning. <u>Id.</u> at 110:13-15. Howard gave the agents permission to search her apartment, which the agents did, and no buy money was recovered.

While McManus and Agent O'Neil were present in Apartment 1, Kevin Poindexter returned to 11 Harold Park. Kevin Poindexter spoke to Howard and then told McManus and Agent O'Neil that Sheridan and Sheridan's wife, "Short," were in Apartment 1 that morning. Id. at 47:13-20. Kevin Poindexter also told McManus that he and Sheridan were first cousins. [#307 at 26:1-6].

### N.  **The Criminal Complaints and Detention**

On September 24, 2010, McManus filed an application for a criminal complaint for drug crimes (distribution of a Class B substance, distribution of a Class B substance within a school zone, possession with intent to distribute a Class B substance, conspiracy to violate drug laws, and possession with intent to distribute within a school zone) and gun crimes (illegal sale of a large capacity firearm, illegal sale of a large capacity feeding device, possession of a firearm with obliterated serial number, receiving a firearm with an obliterated serial number, unlawful possession of ammunition, possession of a firearm while committing a felony), all related to the events of the day before. [#312-11 at 7]. The accompanying narrative, prepared by McManus, stated that the cooperating witness was equipped with electronic surveillance equipment and supplied with $3,700 of photocopied buy money. Id. The narrative reported further that the cooperating witness "was observed by surveillance entering 11 Harold [Park] Apt #3," and that when he departed and was debriefed he reported that Davis had offered to sell him a high capacity firearm for $3,000 and approximately one half ounce of crack cocaine for $700, and that he had paid David $3,700 for the firearm, magazine, ammunition and crack cocaine. Id.

The narrative further stated that Davis was arrested while in possession of $3,573, $600 of which was recorded buy money, and that crack cocaine was seized from Apartment 3 which Dedrea Poindexter-Davis claimed was hers. The narrative reported further that "Davis was found

in possession of $3,573, which was seized and returned to the Suffolk Coun[ty] District Attorney's Office." Id.

McManus also filed on the same day an application for a criminal complaint for distribution of a Class B substance and Distribution of a Class B substance within a school zone relating to the September 16 controlled buy. [#312-10]. The application was supported by an incident report, prepared on September 24 at McManus's direction by Boston Police Officer Stephen Murphy. This report stated that McManus (along with other officers) conducted a drug investigation at Harold Park, Apartment 3, and that the investigators "conducted a purchase of three plastic bags of crack cocaine" from Davis "with the assistance of a cooperating witness (CW) who made the actual buy." The report stated further that the CW "paid suspect Davis $640.00 USC in funds . . . and in return, was handed the three P/B's of crack cocaine by Herbert Davis." [#312-3].

At least in part as a result of these serious charges, Davis was held on bail. [#302 at 9:7-11:5; #312-2].

At some point, Assistant District Attorney Brian Fahy contacted McManus requesting a copy of the electronic surveillance video. [#292 at 112:23-113:2]. McManus testified that he retrieved the video that same day from the FBI and gave it to Attorney Fahy. Id. at 113:5-11. Sometime later, McManus heard from another prosecutor, Assistant District Attorney Kate Hinman, who stated that there was an issue with the video. In late January 2011, in the presence of Attorney Hinman, McManus watched the video for the first time. Davis was not the person depicted on the tape engaging in the transaction with Sheridan. On March 28, 2011, the Suffolk District Attorney's Office filed a *nolle prosequi* and dismissed the case against Davis. [#312-1].

## II.    STANDARD OF REVIEW

A motion for judgment as a matter of law may only be granted "when, after examining the evidence of record and drawing all inferences in favor of the nonmoving party, the record reveals no sufficient evidentiary basis for the verdict." Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 75 (1st Cir. 2001). "Ultimately, courts may only grant a judgment contravening a jury's determination when the evidence points so strongly and overwhelming in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party." Jones ex. Rel. U.S. v. Mass. Gen. Hosp., 780 F.3d 479, 487 (1st Cir. 2015) (internal citations and quotations omitted).

This standard is "especially exacting where, as here, the moving party bears the burden of proof on the issue in question." Marrero v. Goya of P.R., Inc., 304 F.3d 7, 22 (1st Cir. 2002). The party with the burden of proof is entitled to judgment as a matter of law "only if it has established its case by 'testimony that the jury is not at liberty to disbelieve.'" Id. (quoting Jordan v. United States Lines, Inc., 738 F.2d 48, 49 (1st Cir. 1984)). Relief under Rule 50 where the moving party bears the burden of proof on the issue "is warranted only if the moving party's evidence is 'uncontradicted and unimpeached.'" Marrero, 304 F.3d at 22 (quoting Serv. Auto Supply Co. of P.R. v. Harte & Co., 533 F.2d 23, 25 (1st Cir. 1976)).

"A district court's power to grant a motion for a new trial is much broader than its power to grant a [judgment as a matter of law]." Jennings v. Jones, 587 F.3d 430, 436 (1st Cir. 2009). "When deciding whether to grant a new trial, a district court is free to independently weigh the evidence," id. at 436, and "consider the credibility of the witnesses who had testified." MacQuarrie v. Howard Johnson Co., 877 F.2d 126, 132 (1st Cir.1989). "[T]he new trial motion standard of review is concerned with whether the verdict is against the weight of the evidence"

or whether "action is required in order to prevent injustice." <u>Jennings</u>, 587 F.3d at 436-38. The court "may order a new trial 'even where the verdict is supported by substantial evidence.'" <u>Id.</u> at 439 (quoting <u>Lama v. Borras</u>, 16 F.3d 473, 477 (1st Cir.1994)).

## III.   MOTION FOR JUDGMENT AS A MATTER OF LAW

To prevail on a 42 U.S.C. § 1983 claim, Davis needed to establish at trial that McManus, acting under color of law, deprived him of his constitutional rights. <u>See</u> <u>Gomez v. Toledo</u>, 446 U.S. 635, 640 (1980). The Parties do not dispute that McManus was acting under color of law. [#246 at 9] ("The parties stipulate that, at all relevant times, McManus was acting under the color of law"). Davis asserted that he was deprived of his constitutional rights by an arrest made without probable and by a malicious prosecution. The court addresses each in turn.

### A.   <u>False Arrest</u>

Probable cause to arrest exists "when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime." <u>United States v. Young</u>, 105 F.3d 1, 6 (1st Cir. 1997) (citation omitted). "The inquiry into probable cause focuses on what the officer knew at the time of the arrest and should evaluate the totality of the circumstances." <u>United States v. Vongkaysone</u>, 434 F.3d 68, 73 (1st Cir. 2006) (citations omitted). "[A]n informant's statements need not be fully corroborated for an officer to conclude that they are generally reliable." <u>Id.</u> at 74.

Here, whether weighing the evidence in the light most favorable to McManus and crediting McManus's testimony or independently weighing the evidence, there was probable cause to arrest Davis. McManus had obtained information provided to him by an informant, Sheridan, and had viewed text exchanges and listened to phone calls purportedly between

Sheridan and Davis or members of Davis's family regarding drug and firearm transactions. On September 16, McManus observed Sheridan enter 11 Harold Park with $1,000 of buy money and exit with cocaine and $320 of buy money. Then on September 22, members of the Task Force observed Sheridan enter 11 Harold Park with $3,700 of buy money and exit 11 Harold Park with a firearm and drugs. Sheridan reported that Davis was present for the first transaction, and directly involved in the second. Sheridan was equipped with recording equipment on both occasions, which suggested that he would not be fabricating the events that he knew were being recorded. McManus searched Davis pursuant to the previously obtained search warrant and found $3,573 on him. These facts are sufficient to lead an ordinarily prudent officer to conclude that Davis had committed a crime and to arrest him immediately after the alleged transaction.

**B.  Malicious Prosecution**

Generally, a "neutral magistrate's determination that probable cause exists for the individual's arrest is an intervening act that could disrupt any argument that the defendant officer had caused the continued unlawful seizure." Hernandez-Cuevas v. Taylor, 723 F.3d 91, 100 (1st Cir. 2013). But this general rule assumes that the information presented to a magistrate judge in an application for a criminal complaint is truthful. The Supreme Court has explained that:

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.

Johnson v. United States, 333 U.S. 10, 13–14 (1948). In order to protect the role and ruling of the magistrate, an officer thus is not at liberty to "sanitize the information supplied" in order to support the officer's own inferences. United States v. Stewart, 337 F.3d 103, 107 (1st Cir. 2003). He must comply with the strictures of the Fourth Amendment and provide all the information

that would allow the magistrate to draw her own inferences. "Meticulous compliance [with the Fourth Amendment] involves more than an agent's own judgment as to the ultimate importance of a piece of information to a judgment of probable cause." Id. Instead, unless "information [is] so trivial, remote or irrelevant that no reasonable official could assign it weight in coming to a decision to issue the warrant," it "should be included—even if, in context, its weight seems too slight to tip the balance away from a finding of probable cause." Id.

When a plaintiff can "demonstrate that law enforcement officers were responsible for his continued, unreasonable pretrial detention, the plaintiff has stated a constitutional injury that may be vindicated through a § 1983 action." Hernandez-Cuevas, 723 F.3d at 100. A malicious prosecution claim under 42 U.S.C. § 1983 against the arresting officer contains the following elements: the Defendant "(1) caused (2) a seizure of the Plaintiff pursuant to a legal process unsupported by probable cause, and (3) criminal proceedings terminated in Plaintiff's favor." Id. at 101; see also Hernandez-Cuevas v. Taylor, 836 F.3d 116, 125 (1st Cir. 2016). There is no dispute that proceedings against Davis terminated in his favor; after four months of pretrial detention, the Suffolk District Attorney's Office filed a *nolle prosequi* and dismissed all charges. The court addresses the remaining two elements in reverse order.

### 1. Was Plaintiff Detained by a Legal Process Unsupported by Probable Cause?

In determining whether the criminal complaint pursuant to which Plaintiff was detained was supported by probable cause, the court begins with the allegations set forth in the application for the complaint. See United States v. Tanguay, 787 F.3d 44, 53 (1st Cir. 2015) (the probable cause determination is limited to "what appears within the four corners of the affidavit").[5] The

---

[5] In order to maintain his malicious prosecution claim, Davis correctly challenges the probable cause determination at the time that the criminal complaints were issued against him and not at the time of his warrantless arrest. See Meehan v. Town of Plymouth, 167 F.3d 85, 90 (1st Cir.

court considers here the omissions and misstatements at issue and whether these were "necessary to the magistrate's probable cause determination." Hernandez-Cuevas, 723 F.3d at 102; see also Burke, 405 F.3d at 82 (In considering whether omissions are material, a reviewing court must "excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the 'corrected' [complaint] would establish probable cause"); United States v. Castillo, 287 F.3d 21, 25 n.4 (1st Cir. 2002) ("With an omission, the inquiry is whether its inclusion in an affidavit would have led to a *negative* finding by the magistrate on probable cause").

As an initial matter, regardless of the omitted or misrepresented information discussed below, there was probable cause that drug and gun crimes were committed by someone at 11 Harold Park on the dates in question, as the officers witnessed Sheridan enter the multi-unit building with buy money on September 16 and September 23 and exit with drugs and/or firearms without the buy money. The determination the magistrate needed to make, however, and the question that is at issue here, was whether there was probable cause that Davis had committed the crimes.

McManus supported the application for the criminal complaint for the September 16 distribution of a Class B substance and distribution of a Class B substance within a school zone, [#312-10], with an incident report, [#312-3], prepared at McManus's direction. [#292 at 74:8-16]. This report stated that McManus (along with other officers) conducted a drug investigation at Harold Park, Apartment 3, and that the investigators "conducted a purchase of three plastic bags of crack cocaine" from Davis "with the assistance of a cooperating witness (CW) who made

1999) (noting that where there was a warrantless arrest, a malicious prosecution claim must be based on the institution of criminal charges, not the arrest).

the actual buy." The report stated further that the CW "paid suspect Davis $640.00 USC in funds . . . and in return, was handed the three P/B's of crack cocaine by Herbert Davis." [#312-3]. This statement was false—even by Sheridan's account, Sheridan did not pay Davis and Davis never handed him any drugs. [#312-16; #292 at 8:16-19]. The false statement was material to the magistrate's determination of probable cause, as the false statement is the only information in the application for the criminal complaint that ties Davis to the September 16 crime.[6]

The application for the criminal complaint relating to the September 23 transaction, prepared by McManus, stated that Davis had $600 of buy money on him when he was searched by McManus immediately after the buy, and that crack cocaine was obtained from a bedroom in Davis's apartment. Neither of these facts are in dispute. The crack cocaine in the apartment along with the $600 of buy money found on Davis's person immediately after the transaction were sufficient facts to provide probable cause as to the September 23 drug transaction, and the issues regarding McManus's reliance on Sheridan discussed below are not material to the September 23 drug charges. But Davis was held on high bail because of the firearm, and accordingly, the critical determination is whether there was probable cause to charge Davis with the firearms transaction.

There was no evidence tying Davis to the firearms other than Sheridan's testimony. McManus's narrative, however, obfuscated this fact. The application reported that the cooperating witness "was observed by surveillance entering 11 Harold [Park] Apt #3." [#312-11 at 7]. This statement was false; while the cooperating witness was observed entering the multi-unit building, he was not observed entering Apartment 3 where Davis resided. [#292 at 103:24-

---

[6] The application also did not alert the magistrate that the information that the transaction had occurred in Apartment 3 was provided by Sheridan and not observed directly by the officers.

104:10]. The application also stated that the investigation was "armed with a Blood warrant" and that the cooperating witness was "equipped with electronic surveillance equipment." McManus omitted the facts that the surveillance equipment was not working and that despite the Blood warrant requiring the return of the tape, the tape was not in the custody of any of the officers listed in the application and had not been returned to the court. The application also referenced a "recorded call" setting up the purchase of the gun, but did not mention that the recording device had "malfunctioned" and there was no recording of this part of the conversation.

The application stated further that the cooperating witness was provided $3,700 for the buy, and that when Davis was searched, he was in possession of $3,573, $600 of which was recorded buy money. The application went on to say that the $3,573 was "returned to the Suffolk Count[y] District Attorney's Office." The application omitted the fact that not just $600 but all of the buy money had been recorded, and therefore the approximately $3,000 that was "returned" to the DA's Office was not buy money. The evidence regarding the $600 of buy money also does not give rise to probable cause that Davis was involved in the firearm sale, where Sheridan had told the officers he paid $700 for the drugs and the prior drug buy for the same amount of drugs was for approximately $640. By contrast, the gun was priced at $3,000.

McManus included Sheridan's statements inculpating Davis: that the person who answered the recorded call finalizing the arrangements for the gun transaction was Davis; that Sheridan met with Davis in Apartment 3; that Davis had offered the gun for $3,000; and that Sheridan paid Davis $3,700 ($3,000 for the gun and $700 for half an ounce of crack cocaine). At the same time, he omitted all information that would allow the magistrate to independently evaluate Sheridan's credibility, making no mention that: (1) at the time of Davis's arrest, Sheridan was only authorized for FBI use on a case-by-case basis due to previous misconduct;

(2) Sheridan had withheld the fact that he was related to Deirdre Poindexter-Davis, Kim Poindexter, and Kevin Poindexter, and the officers only learned of the familial relationship from Kevin Poindexter; (3) Sheridan had withheld the fact that he visited 11 Harold Park socially; (4) $3,000 of the buy money was missing; (5) Sheridan had given the officers the same number for both Kim Poindexter and Davis; and (6) no efforts had been made to verify the phone numbers given for Davis.[7]

In sum, the application submitted to the magistrate tied Davis to the gun allegations only by false statements (that the cooperating witness was surveilled going into Davis's apartment); misleading statements (that $3,573 found on Davis was "returned" to the District Attorney and that a surveillance video and recorded call relating to the transaction existed); and Sheridan's statements with no information to allow the magistrate to independently evaluate Sheridan's reliability. Due to these omissions and misrepresentations, the magistrate was required "to make his probable cause decision on the basis of a tainted submission." Burke v. Town Of Walpole, 405 F.3d 66, 81 (1st Cir. 2005). The court finds that, after false statements are removed and material omissions added, McManus's application was insufficient to allow the magistrate to determine probable cause that Davis committed either the September 16 drug crimes or the September firearm crimes with which he was charged.

### 2. Did McManus "Cause" Plaintiff to Be Detained?

To establish causation, Davis needed to show more, however, than material falsehoods, misrepresentations, or omissions. Instead, "the plaintiff must demonstrate that the actions or

---

[7] Plaintiff argues that McManus should also have included Kevin Poindexter's statement that Sheridan was in the first floor apartment that morning. On the motion for judgment as a matter of law, the court must draw all inferences in favor of the nonmoving party, and accordingly, accepts for purposes of the motion McManus's testimony that he understood Kevin Poindexter to have claimed that Sheridan was at the first floor apartment prior to the controlled buy.

statements of law enforcement officers amounted to deliberate falsehood or . . . reckless disregard for the truth." Hernandez-Cuevas, 723 F.3d at 101. "[A]llegations of police negligence or innocent mistake are insufficient. Id. (quoting Franks v. Delaware, 438 U.S. 154, 171 (1978)). McManus testified that he did not have any concerns about Sheridan's reliability; that when he submitted the affidavit, he believed that the electronic surveillance had properly recorded Davis entering into the transaction; and that he did not know that Davis was not in the video until he viewed the video four months after the arrest. McManus stated further that he did not credit Kevin Poindexter's testimony that Sheridon was in his apartment, in light of Howard's contradictory testimony that no one had been in Apartment 1 all morning. [#292 at 112:1-4]. In any event, McManus understood Kevin Poindexter to be claiming that Sheridan was there prior to the controlled buy, not during the buy. Because the jury was entitled to credit McManus's testimony, and given the stringent standard in assessing a motion for judgment as a matter of law, Davis has not demonstrated as a matter of law that McManus's statements amounted to deliberate falsehood or reckless disregard for the truth.

## IV. MOTION FOR A NEW TRIAL

On a motion for a new trial, the court may independently weigh the evidence and consider the credibility of the witnesses who testified. The court notes here that McManus prepared the affidavit concerning the September 23 events and directed the drafting of the report concerning the September 16 drug purchase after learning that $3,100 of the buy money that McManus had personally obtained from District Attorney was missing. The court finds substantial questions as to Defendant's credibility that bear on the issue of whether the misstatements in the material submitted to the magistrate were made deliberately, recklessly, or merely negligently.

The first question concerns the arrest of Davis's wife, Dedrea Poindexter Davis. McManus wrote in the application for Davis's criminal complaint that Dedrea Poindexter Davis asserted that the crack cocaine found in Apartment 3 was hers and that she was arrested for that reason. [#312-11]. The FBI report written by Agent O'Neil recorded that Kim Poindexter claimed ownership of the crack. [#312-19]. McManus's assertion that Dedrea Poindexter Davis, rather than Kim Poindexter, claimed ownership is undermined not only by the FBI report, but also by the fact that in advance of the search, McManus's own search warrant affidavit specifically asserted that there was probable cause to believe that Kim Poindexter (not Dedrea Poindexter Davis) was engaged in illegal drug distribution. [#312-4].

The second question concerns McManus's failure to return the video to the Superior Court that had issued the Blood warrant. Common sense suggests that given the missing $3,100, the video was promptly viewed—if not by McManus then by other officers who may have relayed to McManus what was (and was not) on the tape. Nevertheless, McManus maintains that he was surprised to learn months later that Davis was not on the video. He offers no explanation for his failure to comply with the court order.

The third question concerns the differences in the FBI reports and McManus's affidavit regarding the statements from Kevin Poindexter. McManus's investigation was conducted as part of a Joint Task Force with the FBI. McManus relied on information from the other agents where that information supported his complaint. He also contends that he was present when Special Agent Ryan spoke with Kevin Poindexter. Yet his affidavit omits an important piece of information which was included in the FBI report. The FBI stated that Kevin Poindexter asserted that Sheridan was carrying a black duffle bag when he came by Apartment 1 that morning. The FBI had given Sheridan a black duffle bag prior to the start of the operation, and there was no

reason that Kevin Poindexter would have known that. Thus, Kevin Poindexter's statement placed Sheridan in Apartment 1 during the controlled buy, contradicting McManus's assertion that Sheridan met with Davis only in Apartment 3.

"[T]he district court has the power *and duty* to order a new trial whenever, in its judgment, the action is required in order to prevent injustice." <u>Kearns v. Keystone Shipping Co.</u>, 863 F.2d 177, 181 (1st Cir. 1988) (emphasis added). Here, where there was substantial evidence to support Plaintiff's claim that McManus's actions amounted to a deliberate falsehood or reckless disregard for the truth resulting in Davis's detention, the court finds that a new trial is required to prevent injustice. This remedy of a new trial affords relief to prevent injustice to one party "without abrogating his opponent's right to a jury trial." <u>Insurance Co. of N. Am. v. Musa</u>, 785 F.2d 370, 375 (1st Cir. 1986).

## V. CONCLUSION

Accordingly, Plaintiff's <u>Renewed Motion for Judgment as Matter of Law or Alternatively for a New Trial Pursuant to Fed. R. Civ. P. 50 and 59</u> [#309] is ALLOWED as to Plaintiff's request for a new trial on his § 1983 malicious prosecution claim and is otherwise DENIED.

IT IS SO ORDERED.

Date: March 19, 2020                                              /s/ Indira Talwani
                                                                 United States District Judge